UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

FELIPE G. VARGAS,

          Plaintiff,

    v.

THOMAS F. EARL, AND GAIL EARL, HIS
SPOUSE; AND GRANT COUNTY,
WASHINGTON,

          Defendants.

NO. CV-06-146-JLQ

**ORDER DENYING GRANT
COUNTY' S MOTION FOR
SUMMARY JUDGMENT RE:
ATTORNEY MALPRACTICE
CLAIM**

    **BEFORE THE COURT** is Defendant Grant County's Motion for Summary
Judgment Re: Attorney Malpractice Claim (Ct. Rec. 168), which the Plaintiff has
responded to in opposition (Ct. Rec. 214) and the Defendants have replied (Ct. Rec.
241).  The motion was heard telephonically on November 25, 2008. Nicholas Jenkins
and Francis Floyd appeared for Grant County.  Thomas Earl appeared *pro se* for himself
and his marital community.  George Ahrend and Garth Dano appeared for the Plaintiff,
Felipe Vargas ("Vargas").

## I.  Statement of Facts

**A.  Procedural History**

    The Plaintiff, Felipe Vargas, filed his initial Complaint on July 15, 2006 (Ct. Rec.
1).  Defendant Grant County filed its Answer on November 28, 2006 (Ct. Rec. 46), and
Defendant Thomas Earl ("Earl") filed his Answer on December 6, 2006 (Ct. Rec. 48).  In
his Complaint, Mr. Vargas alleges civil rights violations against both Grant County and
Mr. Earl; malpractice, breach of fiduciary duty, and violation of the Consumer Protection
Act against Mr. Earl; and negligence on the part of Grant County.

Grant County first moved for summary judgment on January 4, 2008 (Ct. Rec. 64), with Vargas filing a counter-motion for summary judgment on the same day (Ct. Rec. 68). In its Order (Ct. Rec. 105), this court denied Grant County's motion and granted Mr. Vargas' in part. The court granted summary judgment as to the Defendant's affirmative defenses of statute of limitations and/or repose, improper defendant, waiver, estoppel, laches, and exhaustion of administrative remedies.

Mr. Vargas filed his Amended Complaint (Ct. Rec. 121) on June 3, 2008, which Grant County answered on June 23, 2008 (Ct. Rec. 124). The Amended Complaint added an allegation of a *Brady,* 373 U.S. 83 (1963), violation against Grant County. Following the filing of the Amended Complaint, each side filed motions for summary judgment. Mr. Vargas has filed a motion for summary judgment and/or in limine regarding the admission of an allegedly successful and claimed stipulated polygraph examination (Ct. Rec. 165), and a motion requesting partial summary judgment regarding his actual innocence (Ct. Rec. 157). Grant County has filed motions requesting partial summary judgment on Mr. Vargas' *Brady* claim (Ct. Rec. 160) and attorney malpractice claim (Ct. Rec. 168).

**B. Factual Background**

On November 5, 2003, CMS, the daughter of Vargas' live-in girlfriend, contacted Sergeant Randy Coleman of the Quincy, Washington, Police Department and alleged that Mr. Vargas had "touched" her and her sister Yesenia in a "sexually motivated manner." Based on the report filed by Sgt. Coleman, the Grant County Prosecuting Attorney charged Mr. Vargas with three crimes: one count each of first and second degree child molestation and one count of indecent liberties. The Grant County Superior Court issued a warrant for Mr. Vargas' arrest and set bail at $30,000.

The next day, November 6, 2003, Mr. Vargas was dining in Moses Lake with his girlfriend, Delfina Velasquez. Ms. Velasquez, the mother of CMS and Yesenia, and Mr. Vargas returned to their home in Quincy after dinner to find that Sgt. Coleman had left a card on the door informing them that he had taken the children into custody and

requesting that they come to the Quincy police station.  Upon arrival, Mr. Vargas was arrested and incarcerated.  Mr. Vargas remained in jail for some seven months until June 7, 2004.  The charges against him were dismissed with prejudice on August 31, 2004. Mr. Vargas continuously protested that the accusations against him were completely false, being fiction encouraged by a friend of CMS to get Mr. Vargas out of the mother's house.  Within days of Mr. Vargas' arrest CMS told family friends, a Child Protective Services caseworker, the prosecuting attorney's victim-witness coordinator and members of the Quincy Police department that she and her sister had fabricated the allegations of sexual misconduct by Mr. Vargas. She so continues to this day.  However, at her deposition, Yesenia testified that the molestation by Vargas did take place.

On November 7, 2003, the Superior Court raised Mr. Vargas' bail from $30,000 to $100,000 and prohibited him from receiving any phone calls or visits from Ms. Velasquez, his girlfriend and the mother of the two girls.  Defendant Thomas Earl, the holder of an exclusive contract with Grant County for all felony public defense services, alleged to be over 500 cases annually,  was appointed by the court to represent Mr. Vargas, despite the fact that Mr. Earl had been recommended for disbarment by the Washington State Bar Association ("WSBA") on June 18, 2003.  The Grant County Commissioners and prosecutor's office had received a copy of the WSBA disbarment recommendation which alleged the failure of Mr. Earl to perform his duties as the Grant County Defender.  Mr. Earl failed to appear at Mr. Vargas' arraignment hearing on November 10, 2003 and Mr. Vargas remained incarcerated.

Another arraignment hearing was held on November 12, 2003, at which Mr. Earl appeared and entered a plea of "not guilty" on Mr. Vargas' behalf, although Mr. Vargas alleges that Mr. Earl did not speak with him before, during, or after this hearing.  Mr. Vargas alleges that Mr. Earl stated to the court that "I don't know much about this case." Mr. Vargas also alleges that Mr. Earl did nothing to challenge the argument of the Prosecutor for increased bail on the grounds that Mr. Vargas lacked ties to the community.  Mr. Vargas had lived and worked in Quincy for approximately 20 years at

the time.  The court also set a December 1, 2003, discovery cut-off date.  Lacking the funds to post bail, Mr. Vargas remained incarcerated.

Mr. Earl's son, Ryan, visited Mr. Vargas in jail in mid- to late-November, 2003, an interaction that led Mr. Vargas to believe Ryan Earl was his attorney.  Mr. Thomas Earl filed his formal notice of appearance of behalf of Mr. Vargas on November 24, 2003.  Mr. Vargas alleges that Mr. Thomas Earl had no contact with him regarding potential witnesses as the discovery cut-off came and passed.  Also on November 24, 2003, the WSBA approved the recommendation of their hearing examiner to disbar Mr. Earl.

An in-court pre-trial conference was held on December 9, 2003.  Mr.  Vargas alleges that Mr. Earl then informed him that he was his attorney, a fact which surprised Mr. Vargas due to his belief that Ryan Earl was, in fact, his attorney.  Mr. Vargas alleges that Mr. Earl said nothing more to him at the conference.  The court set a trial date of December 23, 2003.  Mr. Vargas was returned to jail and had no contact with Mr. Earl until the scheduled trial date.  The WSBA filed a petition with the Washington Supreme Court for suspension against Mr. Earl on December 15, 2003.

On the scheduled trial date, Mr. Vargas alleges that Mr. Earl ignored all his attempts to assert his innocence, instead telling Mr. Vargas that things looked bad for him and he should plead guilty.  Mr. Vargas claims Mr. Earl told him that he would be out of jail in six months and that a conviction would not affect his legal immigration status.  Mr. Earl then obtained a continuance of the trial date by requesting a Special Sex Offender Sentencing Alternative evaluation.  Mr. Vargas claims he was not consulted about such a procedure and would not have agreed thereto since that evaluation required an admission of wrongdoing, which Mr. Vargas has continuously denied.  Mr. Earl also waived Mr. Vargas' rights to a speedy trial until June 1, 2004.  Mr. Vargas claims he was not consulted and did not consent to such a speedy trial waiver, but he did sign a waiver form, an action he claims he felt he had no choice but to take.  Mr. Vargas continued to be held in jail.

Ryan Earl visited Mr. Vargas in jail in early January, 2004, at which time Mr. Vargas claims Ryan promised to investigate the case further.  Mr. Vargas claims he had no contact with Thomas Earl during this period. The Supreme Court of Washington disbarred Thomas Earl from the practice of law on February 11, 2004, and Grant Country terminated its contract with Mr. Earl on February 17, 2004.  Mr. Earl was subsequently hired by Canfield & Associates, an insurance company covering Grant County, as a litigation specialist and claims representative.  Now without representation, Mr. Vargas remained in jail.

On March 16, 2004, the court appointed attorney Steve Talbot to represent Mr. Vargas.  On March 22, 2004, when he made his first appearance on behalf of Mr. Vargas, Mr. Talbot informed the court that he lacked the criminal defense experience necessary to represent Mr. Vargas.  The court allowed Mr. Talbot to withdraw and appointed attorney Garth Dano to represent Mr. Vargas in his stead.  Mr. Dano did not learn of his appointment immediately, and filed his first notice of appearance on behalf of Mr. Vargas on April 2, 2004, with Mr. Vargas still incarcerated.

The Grant County prosecutor filed a motion objecting to the appointment of Mr. Dano, allegedly on the grounds that he was not appointed by the Grant County Commissioners and that he was too expensive.  The issue was resolved over the Prosecutor's objection and Mr. Dano began conducting discovery.  After interviewing witnesses, Mr. Dano learned of the recantations made by the original accuser and allegedly by her sister.  Upon informing the court of the recantations and Vargas's favorable polygraph results, Mr. Dano successfully moved to have Mr. Vargas released without bail on June 7, 2004.  Mr. Vargas had been in jail for seven months.

While he was incarcerated, Mr. Vargas lost his job at a Simplot food processing facility in Quincy where he had worked prior to his arrest for an hourly wage of $12.41/hour.  On May 21, 2004, while Mr. Vargas was in jail, the facility was purchased by NORPAC Foods, Inc.  All employees who were working for Simplot at the time retained their same job and pay with NORPAC, a benefit Mr. Vargas was unable to avail

himself of due to his incarceration. Upon his release, Mr. Vargas inquired as to his old position, and was offered a janitorial position at $8.00/hour instead. Mr. Vargas accepted this position, and he remained in it until November 24, 2004, when he quit to pursue higher-paying construction and agricultural jobs.

## II. Standard of Review

Summary judgment is appropriate only when there "is no genuine issue as to any material fact and...the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 243 (1986). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The non-movant must, however, do more than show that there is some abstract doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248.

## III. Discussion

Mr. Vargas claims that his constitutional right to effective assistance of counsel was violated by both Grant County and Thomas Earl. Additionally, Mr. Vargas has made a claim of professional malpractice against Thomas Earl and negligence by Grant County. Defendant Grant County contends that the Plaintiff cannot sustain a claim for attorney malpractice or ineffective assistance of counsel because he cannot show an actual trial and conviction took place, followed by post-conviction relief. For the reasons discussed herein, the court does not agree that a lack of a criminal trial is a bar to these claims. Rather, the issue is whether Mr. Vargas was held in jail for over seven

ORDER - 6

months before the charges were dismissed as a proximate result of the negligence of Thomas Earl and Grant County and their violation of his civil rights.

It is undisputed that Mr. Vargas did not stand criminal trial, nor was he convicted, since the Prosecutor dismissed the case.  Ct. Rec. 214 ¶ 27.  The claim by Mr. Vargas of ineffective assistance of counsel and attorney malpractice is predicated upon the conduct of his counsel in pre-trial proceedings.  The issue before the court is whether or not the law prohibits the claims of Mr. Vargas due to the lack of a criminal trial or conviction.

**A.  Ineffective Assistance of Counsel - Thomas Earl**

"To state a section 1983 claim, a plaintiff must allege facts which show a deprivation of a right, privilege or immunity secured by the Constitution or federal law by a person acting under color of state law." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).  In its pleadings, Grant County does not dispute the second required element; that a person must be acting under the color of state law.  However, it should be noted that Mr. Vargas may not maintain a § 1983 civil rights claim against Mr. Earl based on his traditional role as a private attorney.  "[W]e decide...that a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Polk County v. Dodson*, 454 U.S. 312, 325 (1981).

However, Mr. Vargas does not base his civil rights § 1983 cause of action on the actions or failures of Mr. Earl during the course of his representation, but rather in the policy-making actions and administrative decisions of Mr. Earl as the public defender for Grant County.  Ct. Rec. 1, ¶¶ 100-101.  Therefore, Mr. Vargas' § 1983 civil rights claim against Mr. Earl and Grant County are not precluded, nor is his state law claim of negligence against Mr. Earl.  The Supreme Court has recognized the possibility of administrative actions taken by a public defender constituting a civil rights violation.  "It may be...that a public defender also would act under color of state law while performing certain administrative and possibly investigative functions." *Polk County*, 454 U.S., at 312.  This is the theory of the § 1983 civil rights liability alleged by Mr. Vargas.  Ct.

ORDER - 7

Rec. 1, ¶¶ 97-106.  The 9th Circuit has also held that a claim for ineffective assistance of counsel under § 1983 was maintainable against the head of a public defender office for administrative decisions such as the allocation of resources or the institution of policies that resulted in miscarriages of justice.  See *Miranda v. Clark County, Nevada*, 319 F.3d 465, 469-70 (9th Cir. 2003).

> The conduct alleged falls within the type of administrative action adumbrated by the Supreme Court in *Polk County*, when it recognized the possibility that a public defender's 'administrative and possibly investigative functions' would constitute state action...We thus conclude that [the administrative head of the public defender's office] was acting on behalf of Clark County in determining how the overall resources of the office were to spent, and he qualifies as a state actor for the purposes of § 1983.

*Miranda*, 319 F.3d, at 469.  See also *Goldstein v. City of Long Beach,* 481 F.3d 1170 (9th Cir. 2007).

Mr. Vargas argues that Mr. Earl was acting under color of state law, and the Defendants do not argue to the contrary in their motion for summary judgment.  Thus, the remaining question is whether the alleged challenged policy resulted in deprivation of the Plaintiff's constitutional rights to effective representation by counsel.  The Defendants argue that Mr. Vargas can show no deprivation of a constitutional right since the charges against him were dismissed with prejudice.  This court disagrees.

The Supreme Court has held that the right to counsel attaches at arraignment, and recognizes the importance of effective assistance of counsel not just at trial, but during the time preceding a trial.

> During perhaps the most crucial period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself. *Powell v. Alabama*, 287 U.S. 45, 57 (1932).

Given that the right to effective assistance of counsel and due process attaches at the initiation of judicial proceedings, the court recognizes that a person, particularly one incarcerated, can suffer a deprivation of such constitutional rights before a case reaches trial.  In the *Miranda* case discussed above, the 9th Circuit concluded that "[t]he policy, while falling short of the complete denial of counsel, is a policy of deliberate

ORDER - 8

indifference to the requirement that every criminal defendant receive adequate representation, regardless of innocence or guilt. (Citations omitted). This is a core guarantee of the Sixth Amendment and a right so fundamental that any contrary policy erodes the principles of liberty and justice that underpin our civil rights." *Miranda*, 319 F.3d, at 470.

Grant County points to the Supreme Court's ruling in *Strickland v. Washington*. 466 U.S. 668, 686 (1981). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." The Supreme Court was ruling on a petition for writ of habeas corpus in *Strickland*, thus it was logical to focus on the conviction in that situation. This court does not agree that *Strickland* bars all civil claims in cases not reaching trial that allege ineffective assistance of counsel under § 1983. The proper functioning of the adversarial process can certainly be undermined at any stage of the pretrial process after arrest and arraignment, when the right to counsel attaches, even if other factors intervene to prevent a trial or final verdict from being reached, particularly where the prosecution has dismissed the charges. The Supreme Court noted this concept when it stated that "[counsel, however, can also deprive a defendant of the right to effective assistance, simply by failing to render 'adequate legal assistance.' " *Strickland*, 466 U.S., at 686, citing *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). Though a conviction is undeniably the most common harm for which plaintiffs alleging ineffective assistance of counsel seek redress, the court recognizes that other potential harms exist such as unjust pretrial incarceration and does not believe these claims to be barred by *Strickland*.

Most of the case law considers § 1983 claims in the context of underlying criminal convictions. In these cases, there is a clear policy rationale for not allowing § 1983 civil claims without evidence that the alleged constitutional violations have formed the basis for overturning a verdict or conviction, a determination that can only be made by looking to a trial proceeding. If the courts were to allow civil damages to be recovered without

the overturning of the underlying conviction, it would challenge and largely invalidate the criminal conviction.  See *Heck v. Humphrey*, 512 U.S. 477, 484-87 (1994).  Civil actions are not meant to separately adjudicate the merits of a criminal conviction. However, where no conviction has occurred that would be brought into question or potentially undermined by a § 1983 civil rights claim, there is no reason for the court to be bound to judge the claim exclusively through the lens of its potential effect on a conviction or verdict, and therefore disregard pretrial harms to a defendant.

The Defendants herein argue nothing more than the obtuse proposition that a plaintiff cannot sustain a civil rights claim for ineffective assistance of counsel without the underlying criminal case proceeding to trial.  The court disagrees that *Strickland* and its progeny so state or that a person is barred from pursuing a civil rights claim by reason of the charges against him being dismissed.  There are genuine issues of material fact as to whether or not the conduct of Mr. Earl, as an official policy-maker of Grant County, engaged in administrative functions that constituted a violation of Mr. Vargas' constitutional right to the effective assistance of counsel.

## B. Ineffective Assistance of Counsel - Grant County

Under the *Parratt* test, Grant County is an entity acting under the color of state law.  It is recognized that no cause of action exists against a municipality under § 1983 on a *respondeat superior* theory.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). However, there is an exception under which a plaintiff may sustain a § 1983 claim if a municipality's policy, custom, or inaction causes a constitutional violation.  See *Lee v. City of Los Angeles*, 250 F.3d 668, 681-82 (9th Cir. 2001).  This is the theory of liability on which Mr. Vargas bases his § 1983 claim for ineffective assistance of counsel against Grant County.  Ct. Rec. 1, ¶¶ 103-106.  Grant County does not contest this element of the *Parratt* test.  Ct. Rec. 169; Ct. Rec. 241.

Thus, the remaining question is whether the alleged policy resulted in deprivation of the Plaintiff's constitutional rights to effective representation of counsel.  The Defendants argue that Mr. Vargas can show no deprivation of a constitutional right since

ORDER - 10

the charges against him were dismissed with prejudice. For the reasons discussed above, the court disagrees. Whether or not the actions, or lack thereof, resulting in Mr. Vargas's seven months incarceration, taken by Grant County rise to the level of a violation of Mr. Vargas' constitutional right to the effective assistance of counsel actionable under § 1983 is a genuine issue of material fact. Of import is the Revised Code of Washington (RCW) § 10.101.030 which obligates the County to adopt standards for public defense services using the Washington State Bar Associations standards as guidelines.

**C. Professional Malpractice - Thomas Earl**

"A legal malpractice claim requires proof of an attorney-client relationship creating a duty of care, breach of that duty, damage, and proximate cause...We conclude that both a successful post-conviction challenge and proof of innocence are required to maintain a malpractice claim." *Falkner v. Foshaug*, 108 Wash.App. 113, 118 (Wash.App. Div. 1, 2001).

The Defendants argue that this language creates a simple and absolute bar against Mr. Vargas' cause of action for professional malpractice, since the charges in the case were dismissed with prejudice. It is argued that a person who spent seven months in jail has no legitimate claim for attorney malpractice if the charges against him are later dismissed, regardless of the conduct or inaction of his attorney. The court does not agree with such an interpretation which would give *carte blanche* immunity to the conduct of attorneys during the pretrial phase of proceedings where the charges are later dismissed and the Plaintiff has been incarcerated for seven months, allegedly as the result of the failings of the designated County defender.

In one Washington case, a convicted defendant was allowed to sue his attorney for malpractice when the attorney's egregious error resulted in the defendant serving 20 months instead of the statutorily mandated 12 months. See *Powell v. Associated Counsel for Accused*, 131 Wash.App. 810 (Wash.App. Div. 1, 2006). The narrow holding of the case dispensed with the actual innocence requirement from *Falkner*. However, it can be analogized to the postconviction relief requirement, because it recognizes the harm of

keeping a person in jail for eight months longer than necessary, due to attorney error, and appropriately dispenses with one of the *Falkner* requirements, in light of the unique circumstances, to prevent a miscarriage of justice.

Furthermore, the dismissal of the charges against Mr. Vargas can be interpreted as being analogous to post-conviction relief. In *Ang v. Martin*,154 Wash.2d 477 (Wash., 2005), the Defendants were counseled to accept a plea bargain in a case in which they were later acquitted. After acquittal, the Defendants sued their attorneys who had counseled them to accept the subsequently rejected plea bargain. "By successfully withdrawing their guilty pleas [which had never been formally accepted] and receiving an acquittal on all charges, the [Defendants] unquestionably received the equivalent of post-conviction relief..." *Ang*, 154 Wash.2d, at 483.

As discussed in the context of *Heck v. Humphrey, supra,* the policy rationale of the post-conviction relief requirement is the prevention of civil suits that contest the validity of a criminal conviction. This valid policy consideration cannot be construed as preventing a plaintiff who suffered actual pre-dismissal harm from bringing a malpractice claim, just because the harm suffered did not result in a conviction. The court concludes that Mr. Vargas is not barred by the lack of conviction from bringing a malpractice claim. Whether or not Mr. Earl and Grant County breached their duties of care owed to Mr. Vargas and caused harm thereby is a genuine issue of material fact.

**IT IS HEREBY ORDERED:**

1. Defendant Grant County's Motion for Summary Judgment Re: Attorney Malpractice Claim (Ct. Rec. 168) is **DENIED**.

**IT IS SO ORDERED**. The Clerk of this court shall enter this Order, and forward copies to counsel and Mr. Earl.

**DATED** this 26th day of November, 2008.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 12